Not Reported in A.2d                                                                                                    Page 3
Not Reported in A.2d, 2005 WL 1971865 (Conn.Super.), 39 Conn. L. Rptr. 862
(Cite as: 2005 WL 1971865 (Conn.Super.))

language as applied to the facts of [the] case, including the question of whether the language actually does apply. In seeking to determine that meaning, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter. (Internal quotation marks omitted.)

The first principle of that method is the one codified by the General Assembly in 2003:

The meaning of a statute shall, in the first instance, be ascertained from the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered. General Statutes § 1-2z.

Either alone or when considered in relation to other statutes it is hard to know what to make of § 25-32(f), which is another way of saying that its meaning is not "plain and unambiguous." It reads as follows:

Nothing in this section shall prevent the lease or change in use of water company land to allow for recreational purposes that do not require intense development ... For purposes of this subsection, intense development includes golf courses, driving ranges, tennis courts, ballfields, swimming pools and uses by motorized vehicles ...

*4 Obviously it means what it says; viz., that the department can permit the lease or change in use of water company land to allow for non-intense recreational activities, say, a bocce court or a horseshoe pit.7

Does it also mean, by negative implication, that the department cannot permit changes in use for recreational purposes that do require intense development, such as ballfields and parking areas, as the department claims? Does it mean that non-intense recreational uses *must* be permitted in some form on water company land, and that recreational purposes requiring intense development, such as ballfields and parking areas, are not prohibited but are subject to the usual permitting process set up elsewhere in § 25-32, as the town claims?

This latter interpretation seems particularly unlikely. It flies in the face of subsection (b) of § 25-32, which prohibits a water company from changing the use of "any" watershed lands without a permit from the department, as well as subsections (c) and (e), which

respectively, authorize the department to grant a permit for a change in use of "any land in class II" after considering seven specified factors and restricts the department's authority to grant such a permit for "any land in class II" unless certain conditions exist. "(W)e consider the statute as a whole with a view toward reconciling its parts in order to obtain a sensible and rational overall interpretation." *Wiseman v. Armstrong, supra,* 269 Conn. at 813.

If the town's interpretation were to be accepted, the careful permitting process set up by § 25-32 to protect "the purity and adequacy of any water supply source"; § 25-32(a); would simply not apply to a water company's plan to change the use of its land for a recreational purpose not requiring intense development, regardless of the potential for contamination or interference with the water supply that might be present in that plan.8 The town's interpretation would also render subsection (f) superfluous because applications for changes in use to permit recreational uses requiring intense development are *already* subject to the permitting process. "It is a basic tenet of statutory construction that the legislature did not intend to enact meaningless provisions ... Statutes must be construed, if possible, such that no clause, sentence or word shall be superfluous, void or insignificant ..." (Internal quotation marks omitted; citation omitted.) *Carmel Hollow Assoc.'s Limited Partnership v. Town of Bethlehem,* 269 Conn. 120, 130 (2004).

What of the department's proposed interpretation of subsection (f)? Since the text is unclear and ambiguous, the court may consider "extratextual evidence" of its meaning, such as its legislative history. See § 1-2z. Unfortunately, not a word appears in the committee hearings or legislative debates which addresses this provision of the act or any of the related amendments to the permitting statute. There are clues to a proper interpretation, however, in the "circumstances surrounding its enactment," the "legislative policy it was designed to implement" and "its relationship to existing legislation"; *Wiseman v. Armstrong, supra,* 269 Conn. at 809; and, in this court's view, those clues point to the reasonableness of the department's suggested interpretation.

*5 One comes away from the legislative history of P.A. 00-203 with a clear understanding that its purpose was to preserve and protect the environment in general and watersheds and other lands which contribute to the public water supply in particular. See, e.g., 43 H .R. Proc., Pt. 17, 2000 Sess., pp. 5608-

Not Reported in A.2d                                                                                    Page 4
Not Reported in A.2d, 2005 WL 1971865 (Conn.Super.), 39 Conn. L. Rptr. 862
(Cite as: 2005 WL 1971865 (Conn.Super.))

10, remarks of Rep. Jessie Stratton; pp. 5623-24, remarks of Rep. Kenneth Bernhard; pp. 5626-27, remarks of Rep. Patricia Shea. Toward that end the act created two new grant programs for the purchase of open space or watershed protection land by state and local government. No grant may be made under either program for, *inter alia,* "land to be used for commercial purposes or for recreational purposes requiring intensive development, including but not limited to, golf courses, driving ranges, tennis courts, ballfields, swimming pools and uses by motorized vehicles ..." nor for "land with environmental contamination." See General Statutes § 7-131d(c), as amended by P.A. 00- 203, § 3.9 Nor may grants be made for "development costs, including, but not limited to, construction of ballfields, tennis courts, parking lots or roadways." *Id.* The disfavor with which the legislature viewed recreational land uses requiring intensive development is illustrated by its treating them the same as land to be used for commercial development and environmentally contaminated land.

Furthermore, the act amended the permitting statute, § 25-32, to condition permits for the sale, lease or assignment of class II land on the presence of a permanent conservation easement on the land "to preserve the land in perpetuity predominantly in its natural scenic and open condition for the protection of natural resources and public water supplies while allowing for *recreation consistent with such protection.*" (Emphasis added.) § 25-32(c), as amended by P.A. 00-203, § 7. And, just to make clear that "recreational purposes requiring intensive development" are not "consistent with" protection of the natural resources and public water supplies, the legislature specified that "(p) reservation [of the land] in perpetuity shall not include ... permission" for such uses, as well as for commercial, residential and industrial uses. *Id.* So, under this provision (and a seemingly redundant provision enjoining the department from granting a permit unless such an easement is in place; see § 25-32(e), as amended by P.A. 00-203, § 7) no class II land, the classification of the land in the park, can be sold, leased or assigned unless there is in place a permanent conservation easement which prohibits its use for "recreational purposes requiring intense development," such as ballfields and parking lots.

It is in this context that the meaning of subsection (f) of § 25-32 becomes clear. Subsection (f) permits changes in use for recreational purposes that do not require intense development, the type of recreation "consistent with" the "protection of natural resources

and public water supplies." This necessarily implies that recreational uses requiring intensive development, which are not "consistent with" the "protection of natural resources and water supplies," are prohibited.

*6 This argument by negative implication is based on the axiom "expressio unius est exclusio alterius," translated from the latin to mean, "the expression at one thing is the exclusion of another." See generally *Burke v. Fleet National Bank,* 252 Conn. 1, 22-24 (1999). "Although we have at times interpreted certain statutory provisions as demonstrating a legislative intent to exclude, by implication, other possible referents ... [,] we decline to do so where there is no language, legislative history or statutory purpose suggesting that we reach such a result." (Citations omitted.) *Id.,* at 24.

While the language of P.A. 00-203 could have been clearer, say, by directly prohibiting permits for changes in use for recreational purposes requiring intense development, the legislative history and statutory purpose are sufficiently clear to support the application of this axiom to subsection (f).10 The patent purpose of the act was to protect watershed and other lands which are the sources of the public water supply from influences that would affect their purity and adequacy. These influences included, in the view of the legislature, commercial, residential and industrial development as well as recreational uses requiring intensive development. In view of this determination by the legislature, what sense would it make for the department to be allowed to permit changes in use for the same purposes? At the same time the legislature determined that certain recreational uses are consistent with the protection of natural resources and the water supply, and subsection (f) makes it clear that those uses are permitted by the statute.

The genealogy of the amendments to § 25-32 also supports interpretation of this provision to prohibit intense recreational uses on class II land.11 The amendments were not part of the original bill raised by the joint committee on the environment in the 2000 session. [FN1] Raised Bill No. 5883, An Act Concerning the Open Space Trust Fund. They emerged only after the public hearing on the bill on March 13, 2000, when the committee heard testimony from a representative of the Connecticut Fund for the Environment about the need to strengthen the department's permitting process, the better to protect class II land, "the first line of defense, to protect [the] purity of our drinking water

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                          Page 5
Not Reported in A.2d, 2005 WL 1971865 (Conn.Super.), 39 Conn. L. Rptr. 862
**(Cite as: 2005 WL 1971865 (Conn.Super.))**

supplies." Conn. Joint Standing Committee Hearings, Environment, Pt. 5, 2000 Sess., p. 001505. Thereafter, Substitute Bill No. 5883 emerged from the committee, containing the requirement of a permanent conservation easement before a permit for the sale of any class II land can be issued, with the exclusion of recreational purposes requiring intense development from permissible uses under such an easement. Further refinements to those amendments to § 25-32 were added on the House floor via House Amendment Schedule A, No. 5287, a "strike all" amendment, [FN2] which added the present subsection (f), the provision at issue in this case.

> FN1. In its even year sessions the general assembly may consider only budgetary, revenue and financial matters, bills and resolutions raised by committees of the general assembly and matters certified by the leaders of the general assembly to be of an emergency nature. Conn. Const., amend. III.

> FN2. A "strike all" amendment is one which strikes out everything in a bill after the enacting clause and substitutes new language in lieu thereof. The effect is that the amendment becomes the bill which is to be considered for passage by the general assembly.

**\*7** This aspect of the legislative history of the amendments to § 25-32, including the addition of subsection (f), supports an interpretation that they were added as a piece and with the unified purpose of protecting class II land from sales, leases, assignments or changes in use that would threaten the natural resources or public water supply, including recreational uses requiring intensive development.

Finally, § 25-32 is part of a statutory scheme "whose object is the protection and preservation of the public health that we deem remedial in purpose; accordingly, we construe [it] liberally." *Wallingford v. Department of Public Health, supra,* 262 Conn. at 777-78. Reading the language of subsection (f) to proscribe changes in use for recreational purposes requiring intensive development serves to effectuate the legislative policy of protecting the purity and adequacy of Connecticut's drinking water.

Therefore, the court interprets § 25-32(f) as did the department, i.e., that it not only permits the department to grant a permit for recreational uses not requiring intense development but it also, by negative implication, bars the department from granting a permit for recreational uses requiring intense development, such as the new soccer field and parking lot proposed for the park. [FN3]

> FN3. The town protests that the department has been inconsistent in its interpretation of § 25-32(f) because it granted a change-in-use permit to the town of Danbury to pave a parking lot located on class II land and serving an arts center, despite the statute's inclusion of "uses by motorized vehicles" in the definition of "intense development." Brief of the Plaintiff, *supra,* at pp. 13-14. The town fails to articulate any legal ground on which this alleged inconsistency might aid its case. In any event, whether or not the department has been inconsistent in its interpretation of the statute is irrelevant in view of this court's determination of its meaning.

V

The town claims that reading § 25-32(f) to bar its proposed changes to the park runs counter to General Statutes § 55-3, which provides that, "No provision of the general statutes, not previously contained in the statutes of the state, which imposes any new obligation on any person or corporation, shall be construed to have a retrospective effect." Since the park existed as a recreational facility prior to the effective date of P.A. 00-203's addition of subsection (f) to the permitting statute, the town seems to argue, its proposal to add a new soccer field and parking lot are "modifications to its existing use," not changes in use. Brief of the Plaintiff, Town of Wallingford, Nov. 22, 2004, p. 14.

Of course, this argument is at variance with the town's express acknowledgment in the record that it was applying for a " 'Change in Use' at the Town's Vietnam Veteran's Memorial Park", pursuant to § 25-32. ROR # 1. [FN4] Leaving that contradiction aside, however, the town's position, if accepted, would mean that it (and any other municipality or water company) could make whatever "modifications" or take whatever other actions (e.g., sale or lease of the land) it chose with regard to recreational facilities which existed prior to the passage of the act, without being affected by the restrictions written into the permitting statute by the act.

> FN4. See also Brief of the Plaintiff, Town of Wallingford, Nov. 22, 2004, p. 2 ("On

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2005 WL 1971865 (Conn.Super.), 39 Conn. L. Rptr. 862
(Cite as: 2005 WL 1971865 (Conn.Super.))

February 21, 2002, the Town filed with the DPH an Application for Change in Use.")

The effective date of the amendments to § 25-32 contained in the act was July 1, 2000. The town applied to change the use of the park in the ways spelled out in its application on February 21, 2002. The amended permitting statute imposed no new "obligation" on the town which interfered with its "present or future enjoyment of property." Cf. *Family Financial Services v. Spencer,* 41 Conn.App. 754, 766 (1996). [FN5] Therefore, application of the amended permitting statute to an application filed after its effective date did not violate § 55-3.

> FN5. As pointed out in footnote 3, *supra,* the department recognized that part of the town's application requested only a modification of an existing soccer field to create two Little League fields, which was not barred automatically by the act's amendments to the permitting statute.

## VI

*8 The town's appeal from the decision of the department is dismissed.

----

FN1 Specifically, it is classified as "class II land" i.e., "land owned by a water company ... which is either (1) on a public drinking supply watershed ... or (2) completely off a public drinking supply watershed and which is within one hundred and fifty feet of a distribution reservoir or a first-order stream tributary to a distribution reservoir." See General Statutes § 25-37c(b).

FN2 In *Wallingford v. Department of Public Health, supra,* 262 Conn. at 782, the court held that the entire town government, and not just the water division as a separate entity, is a "water company," as defined by § 25-32a, and all of its land is subject to the department's jurisdiction under § 25-32, including land not used for town water utility purposes.

FN3 The letter of denial opined that the conversion of the existing soccer field to two Little League baseball fields and the slight expansion of the existing parking lot could be considered by the department under its permitting authority because they appeared to be only a "modification to an existing ball field" and the town was invited to submit a separate application for those changes in use. Return of Record (ROR) # 4. No such application has been filed by the town.

FN4 The department had moved to dismiss the town's appeal on the ground that the court lacked subject matter jurisdiction because the department's denial of the permit was not a final decision from which the town could appeal. See file # 103. The court (Levine, J.) denied that motion on March 20, 2003. See file # 109. The department continues to maintain that the court is without subject matter jurisdiction and has indicated its "desire to preserve its right to appeal on this ground." Memorandum of Law dated January 19, 2005, p. 4. See file # 116.

FN5 But see footnote 3, *supra.*

FN6 Section 25-32 was first construed by the Supreme Court in *Wallingford v. Department of Public Health, supra,* 262 Conn. at 774, but subsection (f) was not part of the court's consideration there.

FN7 The court does not mean to suggest that bocce players or horseshoe tossers are not intense about their chosen sports, only that the installation of the facilities necessary for those activities does not appear to require the kind of "intense" development as the other sports listed in the statute.

FN8 The town complains that its proposed interpretation is being misunderstood, and that it is not suggesting that the department has no control over non-intense recreational uses. See Brief of the Plaintiff, Town of Wallingford, p. 12 (Nov. 22, 2004). In the same paragraph it states that "(p)assive use, however, is permitted [under its interpretation], in some manner, *as of right.*" (Emphasis added.) *Id.*

FN9 The same exclusion of "recreational purposes requiring intensive development," with the now familiar descriptive listing of "golf courses, driving ranges, tennis courts, ballfields, swimming pools and uses by motorized vehicles," appeared in Public Act 98-157, An Act Concerning Open Space and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2005 WL 1971865 (Conn.Super.), 39 Conn. L. Rptr. 862
(Cite as: 2005 WL 1971865 (Conn.Super.))

Watershed Land Acquisition, which created an earlier grant program with purposes similar to those of P.A. 00-203. That appears to mark the first appearance in the General Statutes of this phrase. See P.A. 98-157, § 3.

FN10   "The question of statutory interpretation is not ... if the legislature meant that, why did it not say so? The question is, what did the legislature mean by what it *did* say?" (Emphasis original) *State v. Courchesne,* 262 Conn. 537, 554 (2003). [FN6]

FN6. Still another aspect of the legislative history of a statute is its genealogy, which is its historical development over time." *State v. Courchesne, supra,* 262 Conn. at 582.

Not Reported in A.2d, 2005 WL 1971865 (Conn.Super.), 39 Conn. L. Rptr. 862

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d
Not Reported in A.2d, 1995 WL 43771 (Conn.Super.)
**(Cite as: 1995 WL 43771 (Conn.Super.))**

Page 1

**H**
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Superior Court of Connecticut, Judicial District of Fairfield, at Bridgeport.
David CUMMINGS
v.
Roberta D'OYEN.
**No. CV94 0318310S.**

Jan. 31, 1995.

*MEMORANDUM OF DECISION
RE: MOTION TO DISMISS (# 101)*

MAIOCCO, Judge.

*\*1 The plaintiff, David Cummings, brings this action against the defendant, Roberta D'Oyen, to recover for emotional distress allegedly suffered as a result of being arrested pursuant to a complaint made by the defendant. The plaintiff alleges that he was arrested because the defendant accused him of harrassing her. The plaintiff further alleges that these charges were subsequently dismissed by the court.

On December 19, 1994, the defendant filed a motion to dismiss the plaintiffs complaint on the grounds of lack of subject matter jurisdiction and lack of personal jurisdiction. The defendant also filed an affidavit in support of her motion to dismiss. In her affidavit, the defendant states that she is a Commissioner of the Connecticut Workers' Compensation Commission (¶ 2), and that she filed a complaint with law enforcement officials because the plaintiff called her office on numerous occasions and harrassed her. (¶ ¶ 6-9.) The defendant also attests that at the time she made her complaint, she was acting in her capacity as a workers' compensation commissioner. (¶ 11.) The file does not contain any opposition to the defendant's motion. [FN1]

FN1. Practice Book § 143 provides that "[i]f an adverse party objects to this motion to dismiss, he shall, at least five days before the motion is to be considered on the short calendar, file and serve in accordance with

Sec. 120, a memorandum of law...." Nevertheless, Practice Book § 143 has been amended so as to delete the provision that stated that an adverse party who fails to file a timely memorandum in opposition is deemed to have consented to the granting of the motion. *Southport Manor Convalescent Center, Inc. v. Foley,* 216 Conn. 11, 12-13 n. 1, 578 A.2d 646 (1990). Since the plaintiff's failure to object is not per se fatal, the court will consider the motion on its merits, especially in light of the fact that the defendant did not specifically object to the plaintiff's failure to file an opposing memorandum of law.

A. Subject Matter Jurisdiction

"Subject matter jurisdiction involves the authority of the court to adjudicate the type of controversy presented by the action before it." (Internal quotation marks omitted.) *Lewis v. Gaming Policy Board,* 224 Conn. 693, 698, 620 A.2d 780 (1993). "The requirement of subject matter jurisdiction cannot be waived by any party and can be raised at any stage in the proceedings...." (Internal quotation marks omitted.) Id., 698-99. One of the requirements for the court to have subject matter jurisdiction is that there must be an "actual controversy" between the parties. *Harkins v. Driscoll,* 165 Conn. 407, 409, 334 A.2d 901 (1973).

The defendant argues that the court lacks subject matter jurisdiction because there is no "actual controversy" between the parties. The defendant argues that no "actual controversy" exists because at the time she filed the complaint against the plaintiff, she was acting in her capacity as a state official. The defendant argues that as a state official, she owed no duty to the plaintiff in her individual capacity, and therefore, cannot be individually liable to the plaintiff. Thus, the defendant contends that the plaintiff cannot sue her in her individual capacity for filing a complaint against him that resulted in his arrest.

While the defendant attests that she received threatening phone calls from the plaintiff while she was at work (¶¶ 6-9) and that the plaintiff harrassed her with respect to her ruling on his workers' compensation claim (¶ ¶ 2-6), the plaintiff's

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1995 WL 43771 (Conn.Super.)
**(Cite as: 1995 WL 43771 (Conn.Super.))**

complaint is only directed at the defendant in her individual capacity. The plaintiff does not allege in his complaint that the defendant was acting as a state official when she filed her complaint. Even though the plaintiff might have harrassed her while she was in her state office and in relation to her official duties as a workers' compensation commissioner, the legal conclusions stated in the defendant's supporting memorandum and affidavit (i.e., that she was at all times acting in her official capacity) cannot serve as grounds for challenging the court's subject matter jurisdiction. The defendant has offered no proof that filing a criminal complaint against the plaintiff is part of her official duties as a workers' compensation commissioner. Further, at best, the defendant's affidavit raises questions of fact that cannot be resolved on a motion to dismiss. Thus, the defendant's motion to dismiss on the ground of lack of subject matter is denied.

*B. Personal Jurisdiction*

**\*2** The defendant argues that the court lacks personal jurisdiction because she was not properly served with process. The defendant contends that as a state official, she should have been served through the Attorney General's Office, pursuant to General Statutes § 52-64. The sheriff's return states that the sheriff made in hand service of process upon the defendant on October 27, 1994.

General Statutes § 52-64 provides in pertinent part:
  Service in action against state. Service of civil process in any civil action or proceeding maintainable against ... the state or against any institution, board, commission, department ... or against any officer, servant, agent or employee of the state ... may be made by leaving a true and attested copy of the process ... with the attorney general or at his office in Hartford.

The plaintiff does not allege that he sued the defendant, who happens to be a state official, based on a delict committed during the discharge of her official duties. Rather, the complaint appears to state a cause of action against a private citizen. As such, the plaintiff may serve process on the defendant as he would in any civil action. (See General Statutes § 52-54.) Even assuming *arguendo* that this is an action against a state official, the language of § 52-64 is directory rather than mandatory, as this statute provides, in pertinent part, that service of process "may be made by leaving a true and attested copy of the process ... with the attorney general...." Therefore, in either event, the service of process was proper, and

the defendant's motion to dismiss for lack of personal jurisdiction is accordingly denied.

Not Reported in A.2d, 1995 WL 43771 (Conn.Super.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                    Page 1
Not Reported in F.Supp.2d, 2003 WL 23019189 (W.D.Pa.)
(Cite as: 2003 WL 23019189 (W.D.Pa.))

H

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.


United States District Court,
W.D. Pennsylvania.
DICK CORPORATION, Plaintiff,
v.
W. GOLDEN CONSTRUCTION, INC., et al.,
Defendants.
**Civil Action No. 03-839.**

Oct. 27, 2003.

Kevin P. Lucas, Michael W. Hennen, Manion, McDonough & Lucas, Pittsburgh, PA, for plaintiff.

Todd A. Harpst, Roetzel & Andress, Akron, OH, Christopher R. Opalinski, Cornelius J. O'Brien, Eckert, Seamans, Cherin & Mellott, Pittsburgh, PA, for defendants.

*MAGISTRATE JUDGE'S REPORT AND
RECOMMENDATION*

FRANCIS X. CAIAZZA, Magistrate Judge.

**I. RECOMMENDATION**

*1 For the reasons stated below, it is recommended that Golden's Motion for Relief from Default Judgment (Doc. 11) be granted. It is also recommended that Golden's Motion for Leave to File its Answer and Counterclaim Instanter (Doc. 13) be granted.

**II. REPORT**

*BACKGROUND*

1. *Procedural and Factual History*

The Plaintiff Dick Corporation ("Dick") commenced this action against Defendants W. Golden Construction, Inc. ("Golden") and RLI Insurance Co., Inc. ("RLI") in the Court of Common Pleas of Allegeny County on May 5, 2003. *See* Notice of Removal of Civil Action (Doc. 1; hereinafter cited as "Notice of Removal") ¶ 1.

The Complaint essentially involves a construction contract in which Dick served as general contractor to build a Life Sciences Building for The West Virginia University. *See* Compl. (attached as Ex. 1 to Notice of Removal) ¶ 5. In connection with the project, Dick subcontracted all "exterior site concrete work" to Golden--including demolition and removal of certain site concrete and construction of various structures--for a lump sum of $436,900. *See id.* ¶ ¶ 6,7. Pursuant to the subcontract, Golden was required to obtain a performance bond and a payment bond (referred to collectively as "the Bonds"), both of which it subsequently procured from RLI. *See id.* ¶ 11.

According to Dick, Golden inadequately performed its work under the subcontract, and on May 8, 2002, Dick sent notice of default to Golden and asserted claims against RLI under the Bonds. *See generally id.* ¶ ¶ 14-24. After RLI allegedly delayed in investigating Dick's claims, Dick proceeded to complete the work itself. *See generally id.* ¶ ¶ 26-33. It now seeks to recover the costs of completing the project and other damages resulting from Golden's failure to properly perform under the subcontract. *See. id.* ¶ 46.

The Complaint specifically asserts two breach of contract claims against Golden: 1) breach of the subcontract, based generally on Golden's alleged failure to fulfill its obligations under the agreement, *see* Count I; and 2) breach of contract, based on Golden's alleged failure to pay Dick for its completion of the pre-abandonment work, *see* Count II. In addition, it asserts two claims against RLI: 1) breach of the Bonds, *see* Count III; and 2) violations of the West Virginia Unfair Trade Practices statute, W .Va.Code § 33-11-4, *see* Count V. Finally, it asserts the breach of an implied contract against both defendants. *See* Count IV.

On June 5, 2003, RLI filed a Notice of Removal ("the Notice") pursuant to 28 U.S.C. § § 1441 and 1446, based on complete diversity of citizenship. *See generally* Notice of Removal. Two documents were attached to the Notice: a Consent to Removal ("Golden's Consent"), signed by Gregory Fedczak ("Fedczak"), Golden's president, *see* Consent to Removal (attached as Ex. 2 to Notice of Removal); and a Stipulation to Extend Time, providing that the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 23019189 (W.D.Pa.)
**(Cite as: 2003 WL 23019189 (W.D.Pa.))**

Page 2

defendants had until June 20, 2003 to file any responsive pleadings, *see* Stipulation to Extend Time (attached as Ex. 3 to Notice of Removal; hereinafter cited as "Stipulation").

*\*2* On June 23, 2003, RLI filed an Answer and Crossclaim (Doc. 4). Based on Golden's failure to respond, Dick filed and obtained an entry of default against Golden on July 7, 2003. *See* Req. to Enter Default (Doc. 8). On July 8, 2003, Dick filed and obtained a default judgment in the amount of $764,309.00 plus interests and costs. *See* Req. for Default J. (Doc. 9).

On July 16, 2003--eight days after the default judgment was entered and twenty-six days after answers were due--Golden filed a Motion for Relief from Default Judgment ("Golden's Motion for Relief"). *See* Mot. for Relief from Default J. (Doc. 11; hereinafter cited as "Mot. for Relief"). Included in Golden's Motion is a Memorandum in Support, *see* Mem. in Supp. (attached as 3-9 to Mot. for Relief; hereinafter cited as "Golden's Mem."), and an affidavit by Fedczak, *see* Aff. of Gregory Fedczak (attached as Ex. 1 to Mot. for Relief).

On the same day, Golden filed a Motion for Leave to File Answer with Counterclaim Instanter ("Golden's Motion for Leave"). *See* Def. W. Golden Constr., Inc.'s Mot. for Leave to File Answer with Countercl. Instanter (Doc. 13). Golden's Motion for Leave includes a proposed Answer to Plaintiff's Complaint and Counterclaim against Plaintiff. *See* Def. W. Golden Constr., Inc.'s Answer to Pl.'s Compl. and Countercl. against Pl. (attached as Ex. A to Mot. for Leave; proposed Answer hereinafter cited as "Answer"; proposed Counterclaim hereinafter cited as "Countcl.").

Pursuant to this court's order on July 18, 2003 (Doc. 16), responses to Golden's motions were due by August 1, 2003. Both Dick and RLI have filed timely memoranda supporting their respective positions on these motions. *See* Mem. in Opp. to W. Golden Constr., Inc.'s Mot. For Relief from Default J. (Doc. 20; hereinafter cited as "Dick's Mem."); RLI Ins. Co.'s Mem. in Supp. of Motion for Relief from Default J. (Doc. 21). Thus, Golden's motions are now ripe for adjudication.

*2. Legal Standard*

A court may set aside an entry of default "for good cause shown." <u>Fed.R.Civ.P. 55(c)</u>. Where a judgment by default has already been entered, it may

be set aside in accordance with <u>Federal Rule of Civil Procedure 60(b)</u> ( "<u>Rule 60(b)</u>"). *See* <u>Fed.R.Civ.P. 55(c)</u>. <u>Rule 60(b)</u> lists as possible grounds for relief: "mistake, inadvertance, surprise, or excusable neglect .... " <u>Fed.R.Civ.P. 60(b)</u>. As a default judgment has already been entered, <u>Rule 60(b)</u> provides the appropriate analytical framework in this instance. [FN1]

> FN1. Although the court explicitly addresses the issue of setting aside the default judgment under the <u>Rule 60(b)</u> standard, this analysis also implicitly resolves the issue of whether to set aside the underlying entry of default. *See* <u>Feliciano v. Reliant Tooling Co., 691 F.2d 653, 656 (3d Cir.1982)</u> ("[A]ny reasons sufficient to justify the vacation of a default judgment under <u>Rule 60(b)</u> will also justify relief from a default entry.") (citation omitted).

The determination of whether to set aside a default judgment under <u>Rule 60(b)</u> is not resolved by "a rigid formula or [a] per se rule," but is within the sound discretion of the court. *See* <u>Zawadski de Bueno v. Bueno Castro, 822 F.2d 416, 419 (3d Cir.1987)</u> (citation omitted). In exercising that discretion, the court must consider: 1) whether the plaintiff would be prejudiced if the default is lifted; 2) whether the defendant has a *prima facie* meritorous defense; and 3) whether the defaulting defendant's conduct is excusable or culpable. *See* <u>id. at 419-420</u> (citing other decisions from the United States Court of Appeals for the Third Circuit ("the Third Circuit")). [FN2]

> FN2. The undersigned recognizes that some courts have included a fourth element in this test--that is, "the effectiveness of alternative sanctions." *See, e.g.,* <u>Emcasco Ins. Co. v. Sambrick, 834 F.2d 71, 73 (3d Cir.1987)</u>; <u>Cassell v. Philadelphia Maintenance Co., 198 F.R.D. 67, 69 (E.D.Pa.2000)</u>. Neither party has briefed this element, nor do the facts of this case warrant such sanctions; thus, sanctions will not be addresses in the analysis below.

*\*3* In general, default judgments are highly disfavored because the "interests of justice are best served by reaching a decision on the merits." <u>Natasha C. v. Visionquest, Ltd., 2003 WL 21999591 at *1 (E.D.Pa. Aug. 25, 2003)</u> (citations omitted). [FN3] The Third Circuit has thus required that in a "close case, doubts should be resolved in favor of setting aside the default and reaching the merits." <u>Zawadski</u>

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 23019189 (W.D.Pa.)
(Cite as: 2003 WL 23019189 (W.D.Pa.))

Page 3

*de Bueno*, 822 F.2d at 420 (citations omitted). Accordingly, "motions to set aside default judgments are construed in favor of the movant." *Natasha C.*, 2003 WL 21999591 at *1 (citations omitted). In addition, if a district court refuses to reopen a judgment by default, it must make explicit findings concerning the factors it considered in rendering its decision. *See Emcasco Ins. Co. v. Sambrick*, 834 F.2d 71, 74 (3d Cir.1987).

> FN3. This policy against default judgments is particularly strong in cases such as this, where the amount of the default judgment is significant. *See, e.g., Frof, Inc. v. Harris*, 695 F.Supp. 827, 831 (E.D.Pa.1988) (noting specifically that "matters involving large sums should not be determined by default if it can be reasonably avoided") (citations omitted). In *Frof*, the court found that $43,465.83 was a "considerable [amount] and [concluded that] its disposition should not be determined by a default judgment ." *See id.* Here, the amount at issue is $762,309.00, nearly 18 times the amount involved in *Frof.*

*ANALYSIS* [FN4]

> FN4. The court does not reach the parties' arguments under Federal Rule of Civil Procedure 55(b)(2) ("Rule 55(b)(2)")--specifically, whether the service was improper because Golden made an "appearance by implication" and was thus entitled to notice and a three-day waiting period before the entry of default judgment. *See, e.g.,* Golden's Mem. at 4-5; Dick's Mem. at 3-6. First, Golden has failed to cite binding precedent that clearly demonstrates that its Consent to Removal ("Consent") constitutes an implied appearance. *See* Golden's Mem. at 4-5. Second, to the extent that its Consent can be construed as an appearance, the failure to give notice under Rule 55(b)(2) does not in itself require that the court vacate a default judgment. *See, e.g., Natasha C. v. Visionquest, Ltd.*, 2003 WL 21999591 at * 2 (E.D.Pa. Aug. 25, 2003) (stating "[the] failure to give notice [under Rule 55(b)(2) ] does not mandate that this Court vacate the default judgment ... [i]nstead, the decision to set aside the default judgment remains a matter of discretion pursuant to [Federal Rules of Civil Procedure] 55(c) and 60(b)") (citations to

decisions by district courts in Pennsylvania omitted). Thus, the undersigned will rely solely on the analytical framework set out above. *See supra* p. 5-6.

1. *Meritorious Defense*

The threshold issue in determining whether to set aside a default judgment is the existence of a meritorious defense. *See Interior Finish Contractors Ass'n of Delaware Valley v. Drywall Finishers Local Union No.1955*, 625 F.Supp. 1233, 1239 (E.D.Pa.1985). A meritorious defense exists when the "allegations [in the] defendant's answer, if established at trial, would constitute a complete defense to the action." *Natasha C. v. Visionquest, Ltd.*, 2003 WL 21999591 at *4 (E.D.Pa. Aug. 25, 2003) (quoting *United States v. $55,518.05 in U.S. Currency*, 728 F.2d 192, 195 (3d Cir.1984)). The defendant must allege specific facts--something beyond a general denial--and cannot be "couched solely in conclusory language." *Mumps Audiofax, Inc. v. McBride & Assocs., Inc.*, 2001 WL 1450616 at *1 (E.D.Pa. Nov. 13, 2001) (quoting *$55,518.05 in U.S. Currency*, 728 F.2d at 195-96). The defendant, however, need not "prove beyond a shadow of a doubt that [it] will win at trial, but merely show that [it has] a defense to the action which at least has merit on its face." *Dizzley v. Friends Rehabilitation Program, Inc.*, 202 F.R.D. 146, 148 (E.D.Pa.2001) (quoting *Emcasco Ins. Co. v. Sambrick*, 834 F.2d 71, 74 (3d Cir.1987)); *see also Natasha C. v. Visionquest, Ltd.*, 2003 WL 21999591 at * 4 (quoting same).

Here, Dick claims that Golden has failed to plead specific facts sufficient to allege a complete defense to the Complaint. *See generally* Dick's Mem. at 6-8. Instead, Golden has purportedly relied solely on "repeated perfunctory allegations and general denials without the support of any specific underlying facts and which provide no factual basis on which a meritorious defense can be inferred." *See id.* at 7.

To be sure, the list of general denials cited by the Plaintiff would by themselves be insufficient to show the existence of a meritorious defense. *See id.* at 7, n. 4. Nevertheless, after considering the factual allegations contained in the Defendant's Counterclaim--which is explicitly incorporated by reference into its Answer, *see* Answer ¶ 29--the undersigned finds that Defendant has sufficiently averred facts that, if proven, would constitute a valid defense to the Complaint.

*4 According to the Counterclaim, the Plaintiff: 1)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 23019189 (W.D.Pa.)
(Cite as: 2003 WL 23019189 (W.D.Pa.))

failed to timely authorize the Defendant's commencement of work at the scheduled time, causing delays in the Defendant's work schedule, *see* Countercl. ¶ 4; 2) accelerated the Defendant's performance, imposing "unreasonable and unrealistic deadlines" without compensation, *see id.* ¶ 4; 3) refused to compensate the Defendant after unforeseen site conditions were discovered that required additional work outside the contract, *see id.* ¶ 5; 4) improperly interfered with the Defendant's suppliers, making it impossible for the Defendant to obtain supplies and materials needed to complete its performance, *see id.* ¶ 6; and 5) refused to negotiate with the Defendant in good faith to reach a mutually acceptable plan to allow both parties to complete its performance, *see id.* ¶ 7. The Defendant further alleges that Plaintiff's improper termination of the contract has affected its ability to obtain surety bonds, rendering it impossible to continue in its line of work. *See id.* ¶ 9.

If proven, these facts could support, at least, several of the Defendant's affirmative defenses--*e.g.* excuse (*see* Fourth Defense, Answer ¶ 24), waiver and release of claims (*see* Fifth Defense, Answer ¶ 25), breach of the implied duty of good faith and fair dealing (*see* Eighth Defense, Answer ¶ 28), or a complete off-set of all of the Plaintiff's alleged damages due to the Plaintiff's own breach (*see* Ninth Defense, Answer at ¶ 29).

The undersigned therefore finds that the Defendant has met its burden of showing possible defenses that have "at least has merit on [their] face." *Dizzley, 202 F.R.D. at 148* (citation omitted).

*2. Prejudice*

Prejudice arises when "[the] plaintiff's claim would be materially impaired because of the loss of evidence, an increased potential for fraud or collusion, substantial reliance on the entry of default, or other substantial factors." *Natasha C. v. Visionquest, Ltd., 2003 WL 21999591 at \*3 (E.D.Pa. Aug. 25, 2003)* (quoting *Dizzley v. Friends Rehabilitation Program. Inc., 202 F .R.D. 146, 147-48 (E.D.Pa.2001)*).

Dick argues that setting aside the default judgment causes prejudice in two regards. First, the default judgment "may obviate the need to litigate Dick's affirmative claims against Golden and/or RLI in this action at all, or at least may substantially reduce the issues ...." Dick's Mem. at 8. Thus, Dick claims that setting aside the judgment would substantially impact

its right to recover. *See id.* Second, setting aside the default judgment would delay the conclusion of the litigation. *See id.*

Both arguments have been rejected by district courts in Pennsylvania. *See, e.g., Cassell v. Philadelphia Maintenance Co., 198 F.R.D. 67, 69 (E.D.Pa.2000)* (stating "the fact that a plaintiff will have to litigate an action on the merits rather than proceed by default does not constitute prejudice") (quoting *Choice Hotels Int'l, Inc. v. Pennave Assocs., Inc., 192 F.R.D. 171, 174 (E.D.Pa.2000); see also, e.g., Natasha C. v. Visionquest, Ltd., 2003 WL 21999591 at \*3* (stating "mere delay in satisfying a claim rarely establishes the degree of prejudice necessary" to prevent the opening of a default judgment") (citing *Feliciano v. Reliant Tooling Co., 691 F.2d 653, 656-57 (3d Cir.1982)* and *Cassell, 198 F.R.D. at 69.*).

**\*5** The Plaintiff has failed to show the loss of evidence, increased potential for fraud or collusion, or substantial reliance on the default judgment; therefore, there is no prejudice that precludes setting aside the default judgment.

*3. Culpable Conduct*

The third factor to consider is whether Golden failure to timely file responsive pleadings was the result of culpable conduct on the part of Golden. "Culpable conduct means [dilatory behavior] taken willfully or in bad faith." *Natasha C. v. Visionquest, Ltd., 2003 WL 21999591 at \*5 (E.D.Pa. Aug. 25, 2003)* (quoting *Gross v. Stereo Component Sys., Inc., 700 F.2d 120, 123-24 (3d Cir.1983)*). As a threshold matter, "more than mere negligence must be demonstrated." *E.I. DuPont De Nemours & Co. v. The New Press, Inc ., 1998 WL 159050 at \*4 (E.D.Pa. March 16, 1998)* (quoting *Hritz v.. Woma Corp., 732 F.2d 1178, 1183 (3d Cir.1984); see also Cassell v. Philadelphia Maintenance Co., 198 F.R.D. 67, 69 (E.D.Pa.2000)*).

Golden claims its failure to respond in a timely manner was based on two factors. First, operating under the "reasonable" belief that its interests would be represented by RLI's attorney, it did not seek out independent counsel. *See* Golden's Mem. at 3. Second, after becoming aware that RLI's counsel could not represent it, difficulties were encountered in obtaining alternate counsel. *See id.* Specifically, it alleges that it contacted attorney Dave Greenberg, who refused representation because he was retiring. *See id.* It then contacted attorney John Ross in Ohio, who subsequently referred the matter to Golden's

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 23019189 (W.D.Pa.)
(Cite as: 2003 WL 23019189 (W.D.Pa.))

Page 5

current counsel, attorney Todd A. Harpst. *See id.* Golden allegedly did not meet with counsel to review this lawsuit until July 15, 2003, nearly a month after answers were due. *See id.*

Golden maintains that its difficulty in obtaining counsel justified its delayed response. *See id.* at 9. It relies on a decision by the United States District Court for the Eastern District of Pennsylvania in *American Telecom* for the proposition that such difficulties, though potentially negligent, do not constitute bad faith. *See id.* at 9; *Am. Telecom, Inc. v. First Nat'l Communications Network, Inc.,* 2000 WL 714685 (E.D. Pa. June 2, 2000).

Dick does not dispute the fact that Golden encountered difficulties in obtaining counsel; instead it claims that *American Telecom* is distinguishable. *See* Dick's Mem. at 9-10. Relying on decisions by district courts in Delaware and New York, it argues that neither "extreme difficulty" in finding an attorney nor the "mistaken but genuine belief that her interest would be represented and by counsel for her co-defendants" can be construed as excusable negligence. *See id.* at 10-11; *see also United States v. A Single Story Double Wide Trailer,* 727 F.Supp. 149 (D.Del.1989) and *UnitedBank of Kuwait, Plc., v. Enventure Energy Enhanced Oil Recover Assocs.-- Charco Redono Butane,* 755 F.Supp. 1195 (S.D.N.Y.1989).

**\*6** After carefully considering these arguments, the undersigned finds that Golden's conduct--while not condoned by the court--constitutes excusable neglect.

First, the court in *American Telecom* found that difficulty in obtaining counsel is, at least, a mitigating factor in determining culpable conduct. *See Am. Telecom, Inc.,* 2000 WL 714685 at \*4; *see also E.I. DuPont De Nemours & Co. v. The New Press.,* 1998 WL 159050 at \*4 (finding defendant's conduct was not willful or in bad faith where defendant experienced difficulties in obtaining counsel); *A Single Story Double Wide Trailer,* 727 F.Supp. at 153-54 (stating "[e]xtreme difficulty in obtaining representation is a mitigating factor in the [culpability] analysis") (citations omitted). Viewing Golden's allegations in the most favorable light, the undersigned concludes that the its difficulty in obtaining counsel, paired with its initial confusion as to whether it needed to obtain counsel, weigh in favor of finding that its conduct was not willful or in bad faith. [FN5]

    FN5. The undersigned notes that Dick

disputes the reasonableness of Golden's uncertainty in regard to Golden's need to seek independent counsel. *See* Dick's Mem. at 11. For the purposes of this Motion, however, the court must resolve all doubts in favor of Golden. *See Dizzley v. Friends Rehabilitation Program, Inc.,* 202 F.R.D. 146, 148 (E.D.Pa.2001) (citing *Gross v. Stereo Component Sys.,* 700 F.2d 120, 122 (3d Cir.1989)).

In addition, the court recognizes that Golden failed to contact Dick or attempt to get time extensions for filing a response, as the plaintiff had done in *American Telecom. See* Dick's Mem. at 9-10; *American Telecom, Inc.,* 2000 WL 714685 at \*4. Although this distinction is relevant, the undersigned does not believe *American Telecom* represents the outer limit of excusable neglect. *See, e .g., Emcasco Ins. Co. v. Sambrick,* 834 F.2d 71 (3d Cir.1987), discussed below. Thus, Golden's failure to contact Dick is not in itself sufficient to make a finding of culpable conduct.

Second, Golden's promptness in responding to the default judgment further suggests a lack of culpability. Specifically, Golden's response falls within well within time frames set forth under the Federal Rules of Civil Procedure and relevant case law from the Third Circuit. *See* Fed.R.Civ.P. 60(b) (requiring that a motion to vacate default judgment be made not more than one year after the judgment was entered); *see also Emcasco Ins. Co. v. Sambrick,* 834 F.2d 71, 75, 76 (3d Cir.1987) (setting aside a default judgment where defendant did not file an answer for more than six weeks after it was due, stating that while "nothing in the record suggests that this neglect was excusable ... [in the absence of] 'flagrant bad faith[,]' [the defendant's] delinquency did not warrant the 'extreme' action of refusal to vacate the default judgment"). Here, Golden's Motion was filed eight days after the default judgment was entered and less than four weeks after answers were due pursuant to the parties' Stipulation to Extend Time. *Compare* Mot. for Relief (filed on July 16, 2003) *with* Req. for Default J. (filed and entered July 8, 2003) *and* Stipulation (requiring answers to be filed by June 20, 2003). It follows under Rule 60(b) and *Emcasco* that Golden's timely response--where the record otherwise does not demonstrate any "flagrant bad faith"--again weighs in favor of setting aside the default judgment. [FN6]

    FN6. *Accord also Frof, Inc. v. Harris,* 695

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 23019189 (W.D.Pa.)
**(Cite as: 2003 WL 23019189 (W.D.Pa.))**

F.Supp. 827, 831 (E.D . Pa.1988) (finding that defendant's motion was timely and that negligence was excusable where the motion was filed nine months after entry of default).

Finally, recalling the court's "inherent power to ignore minor procedural defects because they should whenever practicable, reach the merits or a case," the undersigned again recognizes that any doubts as to culpability must be resolved in favor of Golden. *See Dizzley v. Friends Rehabilitation Program, Inc.,* 202 F.R.D. 146, 147 (E.D.Pa.2001) (citing *Jorden v. Nat'l Guard Bureau,* 877 F.2d 245, 251 (3d Cir.1989). Because Golden has provided an adequate excuse in this instance, and because Dick has not shown any countervailing evidence of bad faith, the court finds that Golden's conduct does not rise to the level of culpable conduct. *Accord Dizzley,* 202 F.R.D. at 148 (stating "[t]he Court accepts [the defendant's] explanation as valid, especially because evidence of dilatory intent must appear independently in the record ... even if [the plaintiff] had presented some, the Court would nonetheless be required to resolve all doubts in favor of the defaulting party") (internal citations omitted). [FN7]

> FN7. To the extent that this court's result differs from the results in the decisions cited by Dick--*e.g., United States v. A Single Story Double Wide Trailer,* 727 F.Supp. 149 (D.Del.1989); *United Bank of Kuwait, Plc., v. Enventure Energy Enhanced Oil Recover Assocs.--Charco Redono Butane,* 755 F.Supp. 1195 (S.D.N.Y.1989)--they are not binding on this court and therefore it chooses not to follow them.

*7 The undersigned concludes that Golden has shown the possibility of a meritorious defense; that there is no prejudice to Dick in setting aside the default judgment; and that Golden's conduct does not manifest the requisite level of culpability to prevent the default judgment from being set aside. It is therefore recommended that the District Court grant Golden's Motion and set aside the entry of default and default judgment against Golden. [FN8]

> FN8. Dick requests, in the alternative, that the court postpone deciding the merits of Golden's Motion until it is given the opportunity to depose a corporate representative from Golden in regard to whether Golden made an appearance and whether Golden's conduct was culpable. *See* Dick's Mem. at 12. This request is rejected.

*Accord Mumps Audiofax, Inc. v. McBride and Associates, Inc.,* 2001 WL 1450616 at *1 (E.D.Pa. Nov. 13, 2001) (denying plaintiff's request to conduct further discovery on issues relating to motion to set aside entry of default).

Having concluded that the default judgment should be set aside, it is also recommended that the District Court grant Golden's Motion for Leave to File Answer With Counterclaim Instanter, thus permitting it to file its Answer and Counterclaim.

**III. *CONCLUSION***

For the reasons stated above, it is recommended that the District Court grant Golden's Motion for Relief from Default Judgment. In addition, it is recommended that it grant Golden's Leave to File its Answer and Counterclaim Instanter.

In accordance with the Magistrates Act, 28 U.S.C. § 636(b)(1)(B) and (C), and Rule 72.1.4(B) of the Local Rules for Magistrates, objections to this report and recommendation are due by November 12, 2003. Response to objections are due by November 24, 2003.

Not Reported in F.Supp.2d, 2003 WL 23019189 (W.D.Pa.)

**Motions, Pleadings and Filings (Back to top)**

• 2:03CV00839 (Docket) (Jun. 05, 2003)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.                                                                                                          Page 1
Not Reported in F.Supp., 1995 WL 534249 (E.D.Pa.)
**(Cite as: 1995 WL 534249 (E.D.Pa.))**

**H**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, E.D. Pennsylvania.
ACCEPTANCE INSURANCE COMPANY
v.
SDC, INC.
**CIV. A. 95-4557.**

Aug. 31, 1995.

MEMORANDUM OPINION AND ORDER

WEINER, District Judge.

*1 By Memo/Order of August 22, 1995, the court struck the entry of default entered by the Clerk on the grounds that service of process by registered mail upon the foreign corporation defendant was improper under Pennsylvania's rules for service of process. Presently before the court is a motion by the plaintiff to reconsider that ruling. Also before the court is a motion by the defendant to set aside the default. Although it now appears that the courts of Pennsylvania would permit service by mail in this situation, we still find that the entry of default should be set aside.

The Pennsylvania Rules of Civil Procedure are ambiguous with respect to proper service in this instance, in that the rules make no attempt to harmonize the inconsistent provisions with respect to service on corporations and service outside the Commonwealth. Rule 424 specifically governs service upon a corporation and requires hand delivery to an executive officer, partner, trustee, manager, clerk, other person in charge of a regular place of business or an agent authorized to receive service. On the other hand, Rule 404(2) generally authorizes service by mail outside the Commonwealth in accordance with Rule 403, which in turn provides for mailing by any form which requires a receipt signed by the defendant or authorized agent.

The Pennsylvania Superior Court has addressed this issue, concluding that "we simply cannot believe that the [Pennsylvania Supreme] Court intended such a

result", i.e. that Rule 424 requires what its plain language clearly contemplates: that service must be effected by delivery upon corporate defendants. *Reichert v. TRW, Inc.* 561 A.2d 745, 752 (Pa.Super. 1989). Rather, the court found, service by mail on a foreign corporation satisfies the requirements for service of process. While in the absence of such a pronouncement, we would hold with our previously stated construction of the Rule, *see Light and Sound Specialties, Inc. V. Vue-More Manufacturing,* 1990 WL 50568, 1990 U.S. Dist. LEXIS 4672 (Weiner J.)(service by mail upon a corporation is not sufficient under Rule 424), the holding of *Reichert* has been found by at least one other judge of this court to be a persuasive indication of how the Pennsylvania Supreme Court would interpret its own Rule. *City of Allentown v. O'Brien & Gere Engineers, Inc.,* 1995 WL 380019, 1995 U.S. Dist. LEXIS 8850 (Troutman, J.). Accordingly, we find that service of process was adequate.

In its motion to set aside the entry of default, defendant argues that it has meritorious defenses to this action, including that this court has no personal jurisdiction over SDC, venue is improper, and that its motion to set aside the default has been timely proffered. It also avers it has no duty to indemnify the plaintiff, as alleged in the complaint.

Our Court of Appeals has enunciated a strong policy encouraging decisions on the merits of cases and disfavoring default judgments. In exercising its discretion to vacate a default, a district court must consider whether vacating the default will visit prejudice upon the plaintiff, whether the defendant has meritorious defenses and whether default was the result of culpable conduct on the defendant's part. *Harad v. Aetna Casualty and Surety Company,* 839 F.2d 979 (3d Cir. 1988).

*2 Given the rapidity with which the defendant has moved to open the default after receiving notice of its entry, we doubt plaintiff will suffer undue prejudice from proceeding on the merits, other than the obvious requirement of having to present its proofs. There has been no lapse of time causing problems with the marshalling evidence. Further, defendant's jurisdiction and venue defenses are substantial and deserve to be addressed on their merits. Finally, we find the default was not the result of culpable conduct. In his affidavit the president of SDC states

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1995 WL 534249 (E.D.Pa.)
**(Cite as: 1995 WL 534249 (E.D.Pa.))**

Page 2

he received the complaint in the mail on July 27, 1995 and forwarded it to the company's counsel in Missouri. Local counsel states he was retained on August 16, 1995 and that defendant's Missouri counsel was not aware of the exact date service was made on the client. Local counsel immediately contacted plaintiff's counsel to seek an extension of time to file a motion to dismiss the complaint. Plaintiff's counsel would only agree upon an extension of time to file an answer, but not a dispositive motion. Plaintiff's counsel then filed for entry of default two days later on August 18.

Based on the foregoing, we find that the entry of default should be set aside pursuant to Fed. R. Civ. P. 55(c). In the order which follows, we shall direct the defendant to file a motion, supported by an affidavit, setting forth its challenge to the court's jurisdiction. Counsel is directed to inform plaintiff's counsel of the factual basis of his challenge and the cases upon which he will rely, so that plaintiff may answer the motion expeditiously.

ORDER

The motion of plaintiff Acceptance Insurance Company for reconsideration of the court's Memo/Order of August 22, 1995 is GRANTED.

The result of the court's Memo/Order of August 22, 1995, striking the Clerk's entry of default, is AFFIRMED for the reasons expressed is this Memorandum Opinion.

The motion of defendant SDC, Inc. to set aside default judgment, construed as a motion to set aside the entry of default, is GRANTED.

Defendant shall file a motion and an affidavit sustaining his position as to the court's lack of jurisdiction, no later than September 20, 1995. Plaintiff shall file a response no later than September 30, 1995.

IT IS SO ORDERED.

Not Reported in F.Supp., 1995 WL 534249 (E.D.Pa.)

**Motions, Pleadings and Filings (Back to top)**

• 2:95cv04557 (Docket) (Jul. 24, 1995)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.